Magistrate Judge Monica J. Benton

_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED

NOV - 8 2004

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                              DEPUTY

04-MJ-00627-CMP

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,            )
                                     )
                    Plaintiff,       )   MAGISTRATE'S
                                     )   DOCKET NO. 04-627 M
        v.                           )
                                     )   COMPLAINT for VIOLATION
FINN W. CONTINI,                     )   Title 18, United States Code,
ROBERT A. HOWDESHELL,                )   Section 371; Title 18, United States
ALYSON M. CLARK, and                 )   Code, Sections 1341 and 1346; and
CHRISTINE J. HENDRICKSON             )   Title 18, United States Code, Section
                                     )   1957(a).
                    Defendants.      )
_____)

BEFORE, Monica J. Benton, United States Magistrate Judge, Seattle, Washington.

The undersigned complainant, Special Agent Sonya Johnson, being duly sworn states:

## COUNT 1

### (Conspiracy)

1.      From a date uncertain, but no later than in or about September 1999, and

continuing until in or about January 2003, within the Western District of Washington and

elsewhere, the defendants FINN W. CONTINI, ROBERT A. HOWDESHELL, ALYSON

M. CLARK, and CHRISTINE J. HENDRICKSON, together with other persons known and

unknown, did unlawfully, willfully and knowingly combine, conspire, confederate and

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    agree among themselves and with each other to commit certain offenses against the United

2    States, as follows:

3    **A.    Introduction**

4           At all times relevant to this Complaint:

5           2.      Microsoft Corporation (Microsoft), located in Redmond, Washington, was

6    engaged in manufacturing computer software.

7           3.      ClientLogic, located in Buffalo, New York, provided warehousing services

8    to Microsoft, in which Microsoft stored software after manufacturing and prior to sale.

9           4.      Microsoft Internal Product Ordering Service ("IPO"), also known as MS

10   Market, is an on-line ordering feature that allows Microsoft employees to order Microsoft

11   software for business purposes at no cost to themselves.  Microsoft employees who wish

12   to order such software submit an order electronically, via the Internet, specifying the

13   desired type and number of Microsoft software products.  This order is received by

14   ClientLogic.

15          5.      Upon receiving orders for computer software through the IPO program,

16   ClientLogic uses various commercial interstate carriers, including Airborne Express and

17   United Parcel Service, to deliver the software from its warehouse located in Grove City,

18   Ohio, to the address identified on the orders.

19          6.      Microsoft guidelines specifically advised Microsoft employees that use of MS

20   Market is restricted for Microsoft "business purposes."  The MS Market and Internal

21   Product Ordering (IPO) Program Guidelines specifically state, in relevant part:

22                          What is <u>not</u> available through the IPO Program?  The
                            IPO Program has set criteria, which Products must meet
23                          in order to be offered internally.  Products offered
                            through the IPO Program are for *business-use only*.
24
     Microsoft's "General Company Guidelines" also state in relevant part:
25
                            Any violation of the following guidelines or other misconduct
26                          may result in disciplinary action, up to and including immediate

27

28   Complaint/Contini, et al - 2

termination of employment.

* * *

Abuse of any Microsoft privilege, such as...internal orders...This includes any activity, legal or illegal, using your Microsoft position or Microsoft property, equipment or services for personal use or gain.
Removal or use of company property (except for company business), or property of other persons, without written permission.

7.      Although Microsoft software products offered through MS Market's IPO program are available at no cost to the employee, the products have high retail value in the secondary market.  The retail value of the software is based on the "estimated retail price" set by Microsoft, which owns the intellectual property and distribution rights to the software. The retail prices for the software are published on Microsoft's various web sites and other publications.

8.      When submitting an order through MS Market's IPO program, the employee must notify his or her supervisor or manager of the order via the program.  Prior to March 13, 2002, individuals with access to MS Market could manipulate the program to prevent an email alert to the employee's supervisor or manager regarding the employee's ordering activities.

9.      From on or about September 20, 1999, until his resignation on or about February 4, 2002, FINN W. CONTINI was employed by Microsoft as a Group Assistant. During his employment with Microsoft, CONTINI had access to MS Market and the IPO program.

10.     From on or about May 15, 2000, until his resignation on or about October 5, 2001, ROBERT A. HOWDESHELL was employed by Microsoft as a Project Coordinator. During his employment with Microsoft, HOWDESHELL had access to MS Market and the IPO program.

11.     From on or about June 29, 1992, until her termination on or about October 7,

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1 | 2004, ALYSON M. CLARK was employed by Microsoft as a Group Assistant. During her

2 | employment with Microsoft, CLARK had access to MS Market and the IPO Program.

3 |      12.    From on or about March 13, 2000, until her termination on or about June 12,

4 | 2002, CHRISTINE J. HENDRICKSON was employed by Microsoft as a Group Assistant.

5 | During her employment with Microsoft, HENDRICKSON had access to MS Market and

6 | the IPO program.

7 | **B.**    **Object of the Conspiracy**

8 |      13.    The object of the conspiracy was to devise a scheme and artifice to defraud

9 | and for obtaining money and property by means of false and fraudulent pretenses,

10 | representations and promises; and for the purpose of executing such scheme or artifice and

11 | for attempting to do so, knowingly and willfully sent and delivered and caused to be sent

12 | and delivered by private and commercial interstate carrier according to the directions

13 | thereon, Microsoft software products, all in violation of Title 18, United States Code,

14 | Sections 1341 and 1346.

15 | **C.**    **Manner and Means of the Conspiracy and Scheme to Defraud.**

16 |      14.    It was part of the scheme and artifice to defraud that defendants FINN W.

17 | CONTINI, ROBERT A. HOWDESHELL, ALYSON M. CLARK, and CHRISTINE J.

18 | HENDRICKSON used MS Market and the IPO Program to electronically transmit in

19 | interstate commerce, via the Internet, orders for Microsoft software products to ClientLogic

20 | located in Buffalo, New York.

21 |      15.    It was further part of the scheme and artifice to defraud that CONTINI,

22 | HOWDESHELL, CLARK, and HENDRICKSON, in ordering Microsoft software, did not

23 | intend to apply it to any Microsoft "business-use;" rather, they intended to sell it to others

24 | for personal profit.

25 |      16.    It was further part of the scheme and artifice to defraud that although

26 | CONTINI, HOWDESHELL, CLARK, and HENDRICKSON knew that Microsoft

27 |

28 | Complaint/Contini, et al - 4

1  employees were prohibited from using MS Market to order computer software for personal

2  use, they did not reveal to Microsoft that they, in fact, were ordering Microsoft software for

3  personal use, that is, to sell it for personal profit.

4      17.    It was further part of the scheme and artifice to defraud that CONTINI,

5  HOWDESHELL, and HENDRICKSON, manipulated the MS Market ordering system in

6  order that their respective supervisors or managers were not notified of their numerous

7  orders for Microsoft software. Instead, CONTINI, HOWDESHELL and HENDRICKSON

8  would substitute each other's email addresses for those of their supervisors or managers in

9  order to conceal from their supervisors or managers their orders.

10      18.    It was further part of the scheme and artifice to defraud that when CONTINI

11  was no longer employed by Microsoft, CLARK and HENDRICKSON continued to use

12  MS Market and the IPO Program to place orders for  Microsoft software products on

13  CONTINI's behalf in return for a percentage of the sale proceeds received by CONTINI

14  from the resale of the software products in the secondary market.

15      19.    It was further part of the scheme and artifice to defraud that CONTINI,

16  HOWDESHELL, CLARK, and HENDRICKSON used MS Market to fraudulently order

17  from Client Logic the following amounts of Microsoft software products:

| Ordered By | Number of Software Products Ordered | Estimated Retail Value |
|---|---|---|
| CONTINI | 5,400 | $17 million |
| HOWDESHELL | 985 | $4 million |
| CLARK | 618 | $1.7 million |
| HENDRICKSON | 1726 | $9.7 million |
| **Total** | **8729** | **$32.4 million** |

### D.    Overt Acts

20.    In furtherance of the conspiracy and to promote the objects thereof,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

defendants CONTINI, HOWDESHELL, CLARK, and HENDRICKSON, and other persons known and unknown, committed and caused, among others, the overt acts described in Counts 2 through 5 of this Complaint:

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 - 5

### (Mail Fraud)

21.     Sections A (Introduction), C (Manner and Means of Conspiracy and Scheme to Defraud) and D (Overt Acts) of Count 1 of this Complaint are incorporated by reference as though fully set forth herein.

22.     On or about the dates set forth below, in the Western District of Washington, and elsewhere, the defendants FINN W. CONTINI, ROBERT A. HOWDESHELL, ALYSON M. CLARK, and CHRISTINE J. HENDRICKSON, together with other persons known and unknown, having devised, and aided and abetted in devising the above-described scheme and artifice to defraud, did, for the purpose of executing such scheme and artifice, knowingly and willfully cause to be sent and delivered by private and commercial interstate carrier according to the directions thereon, the items listed below, constituting a representative sample of the use of the mails and private and commercial interstate carriers in furtherance of the scheme and artifice to defraud, and is a separate count of this Complaint:

| Count | Date | Ordered By | Sent To | Description of Item |
|-------|------|-----------|---------|---------------------|
| 2 | May 25, 2001 | CONTINI | Sirius Enterprises 14636 NE 45th Street Suite C6 Bellevue, WA 98007 | 25 Windows Advanced Server 2000 with 25 Client Licenses. |
| 3 | Sept. 20, 2001 | HOWDESHELL | ACS 10020 Main St. A263 Bellevue, WA 98004 | 25 Exchange Server Enterprise 2000 with 25 Client Licenses. |

Complaint/Contini, et al - 6

| 4 | May 23, 2002 | CLARK | Alyson Clark<br>Microsoft Corporation<br>4200 150th Ave NE<br>Redmond, WA 98052 | 25 SQL Server 2000<br>Standard Edition<br>with 5 Client<br>Licenses |
| 5 | Jan. 30, 2002 | HENDRICKSON | N. Candy<br>Guardian Enterprises<br>15127 NE 24th Street<br>#297<br>Redmond, WA 98052 | 36 Windows Server<br>2000 with 10 Client<br>Licenses |

It is further alleged that each of these offenses were committed in furtherance of the conspiracy charged in Count 1.

All in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

## COUNTS 6-9

### (Money Laundering)

On or about the dates listed below, within the Western District of Washington, and elsewhere, FINN W. CONTINI, did knowingly engage or attempt to engage in the following monetary transactions, by, through, and to financial institutions, which monetary transactions affected interstate commerce, each transaction being a separate count, and each transaction being a representative sample of the transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, to wit: a scheme and artifice to defraud or to obtain money or property by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Sections 1341 and 1346. The monetary transactions include:

//

//

//

//

//

//

UNITED STATES ATTORNEY<br>700 Stewart Street, Suite 5220<br>Seattle, Washington 98101<br>(206) 553-7970

| Count | Date | Transaction | Amount |
|-------|------|-------------|--------|
| 6 | April 24, 2001 | Deposits check number 1015 from Bank of America Account Number 62796602 in the name of Contini, Inc. to Morgan Stanley Brokerage Account Number 130-024050 in the name of Finn Contini. | $500,000 |
| 7 | June 28, 2001 | Wire transfer from Group Health Credit Union Account Number 122151 to an account in the name of Escrow Partners for the purchase of a condominium located at 11804 NE 80th Street, Unit #1, Kirkland, Washington. | $215,115.57 |
| 8 | Sept. 28, 2001 | Wire transfer from Group Health Credit Union Account Number 122151 to an account in the name of the Chicago Title Company for the purchase of a condominium located at 7323 Old Redmond Rd., #D8, Redmond, Washington. | $285,125.67 |
| 9 | Jan. 23, 2003 | Wire transfer from First Mutual Bank Account Number 011-160031-08 to an account in the name of Eastside Escrow for the purchase of a condominium located at 7323 Old Redmond Rd., #B3, Redmond, Washington. | $308,064.25 |

All in violation of Title 18, United States Code, Section 1957.

Complaint/Contini, et al - 8

## COUNTS 10-14

### (Money Laundering)

On or about the dates listed below, within the Western District of Washington, and elsewhere, ROBERT A. HOWDESHELL, did knowingly engage or attempt to engage in the following monetary transactions, by, through, and to financial institutions, which monetary transactions affected interstate commerce, each transaction being a separate count, and each transaction being a representative sample of the transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, to wit: a scheme and artifice to defraud or to obtain money or property by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Sections 1341 and 1346.   The monetary transactions include:

| Count | Date | Transaction | Amount |
|-------|------|-------------|--------|
| 10 | Nov. 27, 2001 | Check number 491301189 drawn from Washington Mutual Bank Account Number 512-343623-1 made payable to Foss Audio for the purchase of car audio equipment. | $18,500.00 |
| 11 | Jan. 14, 2002 | Washington Mutual Cashiers check drawn from Washington Mutual Bank Account Number 512-343623-1 for the purchase of a 2000 Ford Excursion. | $35,000.00 |
| 12 | Jan. 25, 2002 | Washington Mutual Check Number 519362441 drawn from Washington Mutual Bank Account Number 512-343623-1 for the purchase of a 2002 Sea Ray boat. | $56,903.87 |

Complaint/Contini, et al - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

| 13 | Feb. 13, 2002 | Washington Mutual Check Number 595201021 drawn from Washington Mutual Bank Account Number 512-343623-1 for the purchase of a 2002 GMC Yukon. | $50,493.92 |
| 14 | Oct. 9, 2002 | Washington Mutual Check Numbers 014927872 and 014927873 drawn from Washington Mutual Bank Account Number 512-343623-1 for the purchase of an espresso stand business. | $28,000 |

All in violation of Title 18, United States Code, Section 1957.

And the complainant further states:

## INTRODUCTION

1.      I am employed as a Special Agent with the Internal Revenue Service-Criminal Investigation Division (IRS-CID). I have been employed as a special agent with IRS-CID for almost 20 years. I am currently assigned to the Seattle Field Office. Prior to my current assignment, I worked in the Phoenix Field Office for 18 years. My official duties and responsibilities include the investigation of alleged criminal violations of the Internal Revenue laws and related offenses, including money laundering violations.

2.      The facts set forth in this affidavit are based on my own personal knowledge, and on information obtained from other individuals during my participation in this investigation, including other law enforcement officers and representatives of the victim, Microsoft Corporation; interviews with the subjects of the investigation; my review of documents and financial records related to this investigation; and knowledge gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of this Complaint, it does not set forth every fact that

Complaint/Contini, et al - 10

1  I or others have learned during the course of this investigation.

2  **I      Summary of the Investigation**

3          3.      Evidence collected during this investigation has established that FINN W.
4  CONTINI, ROBERT A. HOWDESHELL, ALYSON M. CLARK, and CHRISTINE J.
5  HENDRICKSON, all former employees of Microsoft, together with others known and
6  unknown, conspired to fraudulently obtain numerous Microsoft software products for resale
7  in secondary markets. CONTINI, HOWDESHELL, CLARK and HENDRICKSON then
8  engaged in financial transactions with the proceeds of their illegal activity by opening
9  numerous bank accounts with the proceeds, transferring the proceeds among those accounts,
10  and purchasing real and personal properties with the proceeds. Together, CONTINI,
11  HOWDESHELL, CLARK, and HENDRICKSON collectively obtained by fraud
12  approximately 8729 pieces of Microsoft software products with a total estimated retail value
13  of over $32 million. The investigation has established that CONTINI, HOWDESHELL,
14  CLARK, and HENDRICKSON together earned more than $3 million through the resale of
15  these Microsoft software products in the secondary market.

16  **II      Trafficking in Pirated or Counterfeit Software**

17          4.      The Business Software Alliance (BSA), an industry group, estimates that in
18  2002 the software industry lost nearly $2 billion in revenue in the United States alone due
19  to software theft. There are five common types of software piracy: End User Piracy, Client-
20  Server Overuse, Internet Piracy, Hard-Disk Loading, and Software Counterfeiting.

21          5.      End User Piracy involves acquiring copies of restricted or non-retail software
22  without a license for commercial use and converting them for commercial sale. Microsoft
23  produces, sells, and distributes certain software titles under special discount licenses to
24  academic institutions, computer manufacturers, and other high-volume customers. This
25  software is labeled "academic edition". Other Microsoft software are produced and
26  distributed for non-retail purposes. Illegal channeling, or mischanneling, occurs when such

27

28  Complaint/Contini, et al - 11

1  software is redistributed to other resellers or users who do not qualify for these special
2  licenses.

3      6.      Client-Server Overuse occurs when too many users are using a central copy of
4  a program at the same time. When local-area network operators install programs on a server
5  for several people to use, they must be sure their license entitles you them do so. If there are
6  more users than allowed by the license, that is "overuse".

7      7.      Internet Piracy refers to the use of the Internet for illegally copying or
8  distributing unauthorized software. The offenders may use the Internet for all or some of
9  their operations including the advertising, offering, acquiring, or distribution of pirated
10 software. One form of Internet piracy involves the use of Internet auction sites to offer
11 counterfeit, out-of-channel, infringing copyright software. The BSA estimates that there are
12 840,000 Internet sites selling illegal software as the real thing. According to Microsoft's
13 website, a recent investigation indicates that more than 60% of software sold through Internet
14 auction sites is counterfeit and more than 90% is sold in violation of the publisher's license
15 agreement.

16     8.      Hard Disk Loading occurs when a business that sells new computers loads
17 illegal copies of software onto the hard disks to make the purchase of the machines more
18 attractive.

19     9.      Software Counterfeiting involves the illegal duplication and sale of copyrighted
20 material with the intent to directly imitate the copyrighted product. In the case of packaged
21 software, it is common to find counterfeit copies of the CDs or diskettes incorporating the
22 software programs, as well as related packaging, manuals, license agreements, labels,
23 registration cards and security features.

24     10.     The above various forms of software piracy are facilitated by brokers and
25 resellers who obtain through illegal means large quantities of "academic edition" software,
26 "not for resale" software, and client-server software for minimal number of users. The

27

28 Complaint/Contini, et al - 12

1  brokers and resellers then chemically remove the words "academic edition" and "not for
2  resale" on client-server software media and alter/increase the number of users on the related
3  end-user license agreements, which increases the value.  After the software is chemically
4  treated, the software, user manual, the fraudulently altered or counterfeit license agreement
5  and fraudulent Certificates of Authenticity are attached together with shrink-wrap for sale.

6      11.     Investigation by the Microsoft Corporate Security and law enforcement
7  discovered that some of these above described brokers and resellers have as their sources for
8  pirated software current and former employees of Microsoft.  Investigation has established
9  that, among other means, the employees exploited a Microsoft Internal Product Order
10 Program to fraudulently obtain software and sell them to such brokers and resellers for a
11 profit.

12 **III    Microsoft Internal Product Order Program**

13     12.     MS Market is a website available to Microsoft full-time employees, official
14 vendors, interns and contingent staff personnel who have been issued network credentials to
15 access Microsoft's internal (computer) network. MS Market contains the Microsoft Internal
16 Product Order (IPO) Program, which allows Microsoft employees to order, among other
17 things, Microsoft software needed to do their jobs.  Products offered through the IPO
18 Program are at no cost to the employee, but are restricted for Microsoft business use only.

19     13.     Employees of Microsoft are made aware of policy regarding the appropriate
20 use of the IPO Program by way of written guidelines. The MS Market and Internal Product
21 Ordering (IPO) Program Guidelines specifically state, in relevant part:

22          What is _not_ available through the IPO Program?   The IPO
           Program has set criteria, which Products must meet in order to
23          be offered internally.  Products offered through the IPO Program
           are for _business-use only_.
24
   Microsoft's "General Company Guidelines" also state in relevant part:
25
           Any violation of the following guidelines or other misconduct
26          may result in disciplinary action, up to and including immediate

27
28 Complaint/Contini, et al - 13

termination of employment.

\* \* \*

Abuse of any Microsoft privilege, such as...internal orders...This includes any activity, legal or illegal, using your Microsoft position or Microsoft property, equipment or services for personal use or gain.

\* \* \*

Removal or use of company property (except for company business), or property of other persons, without written permission.

14.     Even though the software titles ordered through the IPO program are at no cost to Microsoft employees, they have high retail values in the secondary market.  The retail value of the software is based on the "estimated retail price" which is established by Microsoft, which owns the intellectual property and distribution rights to the software. Microsoft sets the retail value price for the software and publishes those prices on its various web sites and in other publications.

15.     When submitting an internal product order, the employee must notify his or her supervisor or manager of the order via the ordering program.  Investigations by Microsoft Corporate Security into the abuse of the IPO Program established that prior to May 13, 2002, a small number of employees took advantage of a design flaw in the IPO Program. Specifically, this flaw created opportunities for fraud by allowing the ordering employee to remove the email address of his or her real manager and substitute the email address of an associate during the order process.  Because of this manipulation, the manager of the employee submitting the internal product order never received email notification of the order activity.

## THE INVESTIGATION OF FINN W. CONTINI

### I     CONTINI's Employment at Microsoft.

16.     CONTINI began his full-time employment at Microsoft on or about September 20, 1999, as a Group Assistant.  As part of his employment with Microsoft, CONTINI was provided with access to MS Market and the IPO Program.  CONTINI's

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1  duties as a Group Assistant included ordering supplies, hardware and software though the

2  IPO Program for his group.

3      17.    Microsoft personnel records show that effective on February 16, 2001,

4  CONTINI went on short-term disability leave from Microsoft.  CONTINI remained on

5  short-term disability leave from Microsoft until August 3, 2001, when he was approved for

6  long-term disability benefits.  CONTINI never returned to Microsoft and was voluntarily

7  terminated effective February 3, 2002.

8  **II      CONTINI's Software Ordering Activity**.

9      18.    The investigation has revealed that during the period of CONTINI's

10 employment with Microsoft, from September 1999, through January 2002, CONTINI

11 ordered approximately 5400 pieces of Microsoft software products through the MS Market

12 and IPO Program.  The orders were directed to be shipped to the following individuals or

13 entities:

| Shipped To | Quantity | Estimated Retail Price |
|---|---|---|
| Ali Raisdanai | 2551 | $8,357,752.00 |
| Sirius Enterprises/Nick Candy | 561 | $1,872,277.00 |
| Integrated Data | 270 | $760,380.00 |
| Finn Contini | 1562 | $6,381,648.00 |
| Miscellaneous | 456 | $247,334.00 |
| **TOTAL** | **5400** | **$17,619,391.00** |

22     19.    Two-thirds of the above summarized orders were placed by CONTINI

23 between February 16, 2001, and February 3, 2002, when he was absent from Microsoft on

24 short-term and then long-term disability leave.  It is believed that CONTINI accessed the

25 IPO program through a Microsoft corporate laptop or through Microsoft software installed

26 on his home computer.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

20.     In addition, 3267 out of the total 5400 software pieces ordered were recorded by the IPO Program as having been approved by ROBERT A. HOWDESHELL. CHRISTINE J. HENDRICKSON is recorded as having approved orders for approximately 90 software pieces.  Neither HOWDESHELL nor HENDRICKSON were authorized by Microsoft to approve CONTINI's ordering activity.   CONTINI had no reporting relationship with HOWDESHELL or HENDRICKSON.

21.     An analysis of the orders revealed that 2551 pieces of Microsoft software ordered by CONTINI were shipped directly to various addresses and entities associated with an individual identified as Ali Raisdanai.  Ali Raisdanai is a former Microsoft employee. CONTINI caused ClientLogic to send software to the following company names and addresses, using several variations on the spelling of Raisdanai's name:

| ADC #160 | A. RAISDANAI | 30251 Golden Lantern, Suite E Laguna Niguel, CA 92677 |
|---|---|---|
| TERATEC | RAIS ALI or AL RA ISDO | 27758 Santa Margarita Pkwy #162 Mission Viejo, CA 92691 |
| VIDCOM #199 | A. RASOLANI or A. RASOLINI | 26741 Portola Pkwy, Suite 1E Foothill Ranch, CA 92610-1743 |
| AR INC. | ALI RAISDANAI or A. RAISDANAI | 23010 Lake Forest Drive, Suite D Laguana Hills CA 92653 |
| A.R. INC. | ALI RAISDANAI | 61 Grenada Street Laguana Niguel, CA 92677 |
| LBC | ALI or ALI RAISDANAI | 26632 Towne Center Drive #230 Foothills Ranch, CA 92610 |
| EVEREADY BATTERY CO AKA ENERGIZER | ALI RAISDANAI | 26440 La Almeda #110 Mission Viejo, CA 92691 |

22.     Four or the seven addresses listed above have been identified as mailbox rental centers.

23.     CONTINI submitted the orders shipped to Raisdanai beginning in or about April 2000, and continuing until in or about December 2001.  The types of Microsoft software ordered by CONTINI and sent to Raisdanai included Visio Enterprise 2000 with an estimated retail value of $999.00 and the SQL Server 2000 Enterprise Edition with an estimated retail value of $14,999.00.  According to Microsoft, CONTINI had no reason in connection with his employment duties to order such types and quantities of software and have it shipped directly to such an individual.

24.     CONTINI also submitted orders for approximately 561 items of software through the IPO Program and caused them to be shipped directly to an entity called Sirius Enterprises, located at 14636 NE 45th Street C-6 in Bellevue, Washington 98007.  The orders for Sirius Enterprises were submitted between May 2001, through July 2001.  The types of software products ordered included Windows Server 2000 with 10 client licenses with an estimated retail value of $1,199.99, and the SharePoint Portal Server 2001 with 25 client licenses with an estimated retail value of  $6,699.00.

25.     The Washington State Department of Revenue's State Business Records Database provides public information about businesses registered in Washington State.  According to this database, Sirius Enterprises is a sole proprietorship opened on January 1, 1997, by CHARLES C. CONTINI and engaged in the business of management consulting services.

26.     A King County District Court "Order Changing Name" dated December 2, 1997, filed with the King County Recorder's Office, shows that CONTINI changed his name from CHARLES CHRISTOPHER CONTINI to FINN WOLFE CONTINI.

27.     The internal product orders for the software he had shipped to Sirius Enterprises were addressed to 14636 NE 45th Street C-6, Bellevue, Washington 98007.  According to King County records, CONTINI owned the condominium at 14636 NE 45th Street C-6, Bellevue, Washington 98007, from September 1995, until March 2002.

Complaint/Contini, et al - 17

1   CONTINI listed 14636 NE 45th Street C-6, Bellevue, Washington 98007, as his address on

2   the employment application he filed with Microsoft in September 1999.

3        28.    The recipient of the software CONTINI had shipped to Sirius Enterprises was

4   "NICK CANDY" or "N. CANDY", which is similar to CONTINI's mother's name, Nancy

5   Condy.

6        29.    The IPO Program orders submitted by CONTINI that were shipped to himself

7   were sent to Microsoft's address at 4200 150th Ave., N.E. Redmond, Washington.

8   CONTINI submitted these orders between September 1999, through December 2000.  The

9   types of software ordered included Microsoft Expedia Streets and Trips 2000 with an

10   estimated retail value of $44.95 and the SQL Enterprise Server 7.0 with unlimited client

11   licenses with an estimated retail value of  $28,999.00.  The majority of the software

12   CONTINI ordered was multi-client server software.

13   **III    CONTINI's Illegal Proceeds.**

14        30.    The investigation has revealed that shortly after CONTINI began to submit

15   orders for large quantities of software through the IPO Program and continuing after he

16   resigned from Microsoft, CONTINI deposited in excess of $2 million in checks from two

17   individuals and their associated entities: Nathaniel P. Angelus/Software Provisions, LLC and

18   Stephen D. Morse/S.M. Distribution.  The investigation has revealed that these two

19   individuals and their entities are engaged in the purchase and resale of fraudulently obtained

20   software.

21       *A.    Nathaniel P. Angelus and Software Provisions, LLC.*

22        31.    Between  May  2000,  and  September  2003,  CONTINI  deposited

23   $1,016,205.84 in checks drawn from accounts in the names of either Nathaniel P. Angelus

24   and Software Provisions, LLC, to the following accounts in the name or control of

25   CONTINI:

26

27

28   Complaint/Contini, et al - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | |
|---|---|
| Group Health Credit Union Account #110326 in the name of Finn W. Contini | $36,966.32 |
| Group Health Credit Union Account #49488 in the name of Nancy J. Condy and Finn W. Contini | $12,925.00 |
| Group Health Credit Union Account #122151 in the names of Finn W. Contini and Nancy J. Condy | $244,170.30 |
| Bank of America Account #531137472 in the name of Nancy J. Condy POD Finn W. Contini | $63,450.96 |
| Bank of America Account #62796602 in the name of Contini, Inc./Finn W. Contini, President | $658,693.26 |
| Total | $1,016,205.84 |

32.     Oregon Secretary of State Corporation Division records show that Software Provisions, LLC, is a domestic limited liability company created on December 13, 2000, and that Nathaniel Angelus of 3132 SW Upper Drive, Portland, Oregon, is a member of Software Provisions, LLC.    Software Provisions, LLC had a website www.softwareprovisions.com that offers software for sale.

33.     On or about May 20, 2002, Microsoft Corporate Security interviewed another former employee, Travis Barth, regarding the theft of Microsoft software from the offices Microsoft employees.    Barth admitted to internal investigators that he stole Microsoft software from employees' offices and sold it to a friend in Portland, Oregon, named Nathaniel Angelus.

34.     Barth said he met Angelus online in 2001, when he had gift software that he wanted to sell on eBay.    Barth stated that he had not met Angelus in person; instead, they communicated by email and telephone.    Barth explained that he mailed the software to Angelus's home address by United Parcel Service using his debit card from the Pony Express in Redmond, Washington.    Barth stated that he had transactions with Angelus in the past, sometimes selling him software that he purchased from the Microsoft Company Store.    Barth said most of the time he contacted Angelus and offered him software for sale, and sometimes

Complaint/Contini, et al - 19

1    Angelus would contact him and ask for specific software.

2         35.     Following Barth's confession, Microsoft Senior Anti-Piracy Investigator

3    Kristen Dietz directed Microsoft's Internet Auction Monitoring Team to be on the lookout

4    for the uniquely marked boxes of software stolen from the offices of Microsoft employees.

5         36.     On June 11, 2002, Dietz received images of one of the uniquely marked boxes

6    of software stolen from a Microsoft employee's office that had been purchased by the

7    Internet Auction Monitoring Team from Software Provisions, the Portland, Oregon, company

8    associated with Nathaniel Angelus.   Specifically, one box of Microsoft BizTalk 2000

9    Enterprise, 1 Processor License, SKU # F52-00003 was purchased from Software Provisions,

10   LLC for $3,295.00, on June 7, 2002.

11        *B.*     *Stephen D. Morse and S.M. Distribution.*

12        37.     Between June 2001, and June 2002, CONTINI deposited $1,348,926.49 in

13   checks and wire transfers from a company known as S.M. Distribution to the following

14   accounts:

| | |
|---|---|
| Group Health Credit Union Account #110326 in the name of Finn W. Contini | $10,000.00 |
| Group Health Credit Union Account #122151 in the names of Finn W. Contini and Nancy J. Condy | $203,591.50 |
| Bank of America Account #62796602 in the name of Contini, Inc./Finn W. Contini, President | $649,079.99 |
| Bank of America Account # 531137472 in the name of Nancy J. Condy POD Finn W. Contini | $485,625.00 |
| Total | $1,348,296.49 |

23        38.     The Maryland Department of Assessments and Taxation (SDAT) Business

24   Entity Information shows that S.M. Distribution was incorporated on October 31, 2000, in

25   Maryland.   The resident agent is Stephen Morse and the principal office address and the

26   resident agent's address is 1623 Coopers Way, Frederick, Maryland 21701.   The current

28   Complaint/Contini, et al - 20

1   mailing address of S.M. Distribution is 43262 Mission Hills Way, Leesburg, Virginia 21076.

2      39.      The Maryland SDAT Real Property Data Search shows that Stephen Morse

3   owned the townhouse located at 1623 Coopers Way, Frederick, Maryland 21701, from 1996

4   through March 30, 2001.

5      40.      The Loudon County, Virginia Real Estate Tax, Assessments, and Parcel

6   Database shows that Stephen Morse purchased the residence located at 43263 Mission Hills

7   Way, Leesburg, Virginia 20176, on April 6, 2001.

8      41.      In a written statement provided to Microsoft, another former Microsoft

9   employee, Stephen Hnetinka, admitted to selling internally ordered software to a "David

10   Morse" of S.M. Distribution in Virginia.

11      42.      According to Hnetinka, Morse initially contacted Hnetinka in June or July of

12   2001, after he found Hnetinka selling software on eBay. Morse told Hnetinka to contact him

13   directly when he had software to sell rather than use eBay. Hnetinka stated that Morse

14   convinced him to place internal product orders for software and sell it to him. Hnetinka's

15   internal product orders for software were initially small, but became larger when he realized

16   he could easily order more software. Morse asked Hnetinka for specific software available

17   through MS Market.

18      43.      Hnetinka sent about 20 shipments of internally ordered software products to

19   Morse in Virginia. Two Federal Express airbills dated April 18, 2002, and September 23,

20   2002, show that Hnetinka sent four packages to a David Morse at 20925 Professional Plaza,

21   Ashburn, Virginia, 20147. According to Hnetinka, Morse paid Hnetinka between $1,000 and

22   $10,000 for each shipment of software. Hnetinka estimated that he received $50,000 to

23   $60,000 from Morse in the course of one year. On a number of occasions, Morse told

24   Hnetinka that he had people ordering internal (Microsoft) software (through the IPO

25   Program) that would get him thousands of pieces.

26   //

27

28   Complaint/Contini, et al - 21

**IV     CONTINI'S Financial Transactions with Proceeds of Illegal Activity.**

44.     Prior to October 2000, the only known bank accounts for CONTINI were a Group Health Credit Union account number 110326 in the name of FINN CONTINI and a second Group Health Credit Union account number 49488 in the names of FINN CONTINI and his mother, Nancy Condy. From January 1999, through April 2000, no significant deposit activity can be discerned in these accounts, other than regular deposits from CONTINI's employment at Microsoft.

45.     CONTINI earned a total of $10,445.34 in wages at Microsoft in 1999, $29,567.50 in 2000, $14,085.41 in 2001 and $1,052.17 in 2002, according to his Forms W-2, Wage and Tax Statements obtained from Microsoft. CONTINI was voluntarily terminated from Microsoft on or about February 3, 2002, after having been placed on disability leave for nearly a year.

46.     In connection with his employment at Microsoft, CONTINI was granted options to purchase limited number of Microsoft stock, first on July 31, 2000, and again on February 12, 2001. None of these options were exercised and both grants were cancelled.

47.     The State of Washington Employment Security Department records show that CONTINI has not been employed since the first quarter of 2002.

48.     As noted above, beginning May of 2000, and continuing through September 2003, CONTINI received and deposited over $2 million in checks and wire transfers from Nathaniel Angelus/Software Provisions, LLC and Stephen Morse/S.M. Distributions. Beginning in October 2000 and continuing through September 2003, CONTINI opened at least 14 different checking, savings, time deposit, and brokerage accounts with Group Health Credit Union, Bank of America, First Mutual Bank, Morgan Stanley, Ameritrade, and Scotttrade. These accounts were used by CONTINI to engage in numerous monetary transactions involving the proceeds derived from the sale of the fraudulently obtained Microsoft software, including the following:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

49.     On or about April 24, 2001, CONTINI withdrew $500,000 from Bank of America account number 62796602 in the name of Contini, Inc. to open a Morgan Stanley brokerage account number 130-024050 in the name of Finn Contini.

50.     On or about June 28, 2001, CONTINI withdrew by wire transfer $215,115.57 from the Group Health Credit Union account number 122151 in the name of Finn Contini for the purchase of a condominium located at 11804 NE 80th Street, Unit #1, Kirkland, Washington.

51.     On or about September 28, 2001, CONTINI withdrew by wire transfer $285,125.67 from the Group Health Credit Union account number 122151 in the name of Finn Contini for the purchase of a condominium located at 7323 Old Redmond Rd., #D8, in Redmond, Washington.

52.     On or about January 23, 2003, CONTINI withdrew by wire transfer $308,064.25 from the First Mutual Bank Account Number 011-160031-08 in the name of Finn Contini for the purchase of a condominium located at 7323 Old Redmond Rd., #B3, in Redmond, Washington.

## INVESTIGATION OF ROBERT A. HOWDESHELL

### I    HOWDESHELL's Employment with Microsoft.

53.     HOWDESHELL began his full-time employment with Microsoft on or about May 15, 2000, as a Project Coordinator in US-BED Driver Quality. HOWDESHELL was provided access to MS Market and the IPO Program as an employee of Microsoft. However, HOWDESHELL had no legitimate business reason in connection with his employment duties to submit internal product orders for software through the IPO Program.

54.     On or about September 9, 2001, HOWDESHELL informed his supervisor that he would not be reporting to work for several weeks because of an ailing family member. HOWDESHELL subsequently never returned to work at Microsoft. On September 30, 2001, HOWDESHELL requested extended leave, but was denied. HOWDESHELL was

Complaint/Contini, et al - 23

1  officially terminated from Microsoft effective October 5, 2001.

2  **II    HOWDESHELL's Ordering Activity.**

3      55.    Beginning in or about July 2001, and continuing through in or about October

4  2001, including the period of time when HOWDESHELL was on leave from Microsoft,

5  HOWDESHELL submitted through the IPO Program orders for 985 pieces of Microsoft

6  software products as follows:

| Shipped To | Quantity | Estimated Retail Price |
|---|---|---|
| Rob Howdeshell | 37 | $185,583.00 |
| Advanced Computer Specialties or ACS | 948 | $3,988,052.00 |
| **Total** | **985** | **$4,173,635.00** |

12      56.    The types of software ordered by HOWDESHELL included Windows XP

13  Professional at an estimated retail value of $299.00, and Exchange 2000 Enterprise with 25

14  Client Licenses with an estimated retail value of $6,999.00.

15      57.    According to the IPO Program records, HOWDESHELL listed FINN

16  CONTINI as his approving manager on orders for 969 out of the 985 software pieces he

17  ordered.    CONTINI had no approval authority for HOWDESHELL's orders.

18  HOWDESHELL had no reporting relationship to CONTINI.

19      58.    The majority of the orders were initiated by HOWDESHELL beginning on

20  September 12, 2001, through October 7, 2001, the same period of time HOWDESHELL

21  was on leave from Microsoft. During this period of time, HOWDESHELL ordered 948

22  pieces of Microsoft software and caused them to be delivered to an entity named Advanced

23  Computer Specialties or ACS, at 10020 Main Street, A263, Bellevue, Washington, 98004.

24      59.    The investigation has established that the listed address is a mail drop at "The

25  Mailbox," a mail box rental center located at 10020 Main Street A in Bellevue, Washington.

26  An "Agreement" with the Mailbox and Postal Service Form 1583, Application for Delivery

27

28  Complaint/Contini, et al - 24

1  of Mail Through Agent, both dated September 11, 2001, demonstrate that the mail drop was
2  rented by ROBERT A. HOWDESHELL. HOWDESHELL signed both the Agreement and
3  Application and provided his Washington Driver's License and a Washington Mutual Visa
4  Card in his name as identification. The Agreement and Application show that the purpose
5  of the mail drop was for business use under the name Advanced Computer Specialties. The
6  business address was the same as HOWDESHELL's home address at that time, 14035 90th
7  Place NE, Bothell, Washington, 98011.

8      60.    No record of a business with the name of Advanced Computer Specialties or
9  a business owned by HOWDESHELL was found in the Washington State Department of
10 Revenue's State Business Records Database.

11 **III    HOWDESHELL's Proceeds of Illegal Activity.**

12     61.    HOWDESHELL earned $34,435.92 in wages at Microsoft in the year 2000,
13 and $45,927.23 in the year 2001, according to his Forms W-2, Wage and Tax Statements
14 obtained from Microsoft. Microsoft payroll records show that during 2001, Microsoft
15 deposited HOWDESHELL's semi-monthly pay directly to his checking account number
16 512-343623-1 at Washington Mutual. Microsoft deposited HOWDESHELL's final net pay
17 of $1,280.48 to this account on October 15, 2001.

18     62.    According to the "Non-Qualified Stock Option Agreement for Purchase of
19 Stock Under the 2001 Stock Plan of Microsoft Corporation", Grant Number 0265422,
20 Microsoft granted HOWDESHELL 240 stock options on February 12, 2001, at the grant
21 price of $29.3750. This agreement gave HOWDESHELL the option to purchase 120 shares
22 of Microsoft common stock for a price of $58.75 per share. HOWDESHELL's right to
23 purchase one-eighth of the shares covered under the option agreement vested on February
24 12, 2002, and the right to purchase additional one-eighth increments of the shares would
25 vest at six-month intervals, thereafter, such that his option would become fully vested fifty-
26 four months after the grant date. All of HOWDESHELL's 240 options, however, were

27

28  Complaint/Contini, et al - 25

1    cancelled and none was exercised.

2         63.    According to HOWDESHELL's estranged wife, Elizabeth Howdeshell,
3    HOWDESHELL has been unemployed since his resignation from Microsoft. State of
4    Washington Employment Security Department records confirm that the only wages paid
5    to HOWDESHELL for the time period October 1, 2001, through December 31, 2003, were
6    $1,728.55 (gross wages) paid by Microsoft for the fourth quarter of 2001.

7         64.    The investigation has revealed, however, that from October 21, 2001, after
8    HOWDESHELL received his final pay from Microsoft, through April 2003, when he closed
9    the account, HOWDESHELL deposited over $740,000 into a Washington Mutual joint
10   checking account number 512-343623-1 in his and his wife's name. HOWDESHELL,
11   however, has not filed any federal income tax returns for those years.

12   **IV    HOWDESHELL's Financial Transactions**.

13        65.    With the extensive use of cashier's checks, HOWDESHELL purchased
14   numerous big-ticket items with the proceeds from the sale of the fraudulently obtained
15   software that were deposited into his Washington Mutual Bank Account number 512-
16   343623-1.

17        66.    On or about November 27, 2001, HOWDESHELL withdrew $18,500 from
18   the Washington Mutual Bank account 512-343623-1 for the purchase of car audio
19   equipment from Foss Audio.

20        67.    On or about January 14, 2002, HOWDESHELL withdrew $35,000 from the
21   Washington Mutual Bank account 512-343623-1 for the purchase of a 2000 Ford
22   Excursion.

23        68.    On or about January 25, 2002, HOWDESHELL withdrew $56,903.87 from
24   the Washington Mutual Bank account 512-343623-1 for the purchase of a 2002 Sea Ray
25   boat.

26        69.    On or about February 13, 2002, HOWDESHELL withdrew $50,493.92 from

27

28   Complaint/Contini, et al - 26

1  the Washington Mutual Bank account 512-343623-1 for the purchase of a 2002 GMC

2  Yukon.

3      70.    On or about October 9, 2002, HOWDESHELL withdrew $28,000 in two

4  checks from the Washington Mutual Bank account 512-343623-1 for the purchase of an

5  espresso stand business.

6            **INVESTIGATION OF ALYSON M. CLARK**

7  **I**    **CLARK's Employment with Microsoft.**

8      71.    CLARK was began full-time employment with Microsoft on or about June

9  29, 1992, as a Group Assistant.  Clark was employed by Microsoft continually in the

10  capacity of a Group Assistant until her termination on or about October 7, 2004.

11      72.    CLARK was provided access to MS Market and the IPO Program as an

12  employee of Microsoft.  CLARK's duties as a Group Assistant included ordering supplies,

13  hardware, and software through the IPO Program for use by the group to which she was

14  assigned.

15  **II**    **CLARK's Ordering Activity.**

16      73.    Beginning in or about April 2002, and continuing through in or about

17  November 2002, CLARK submitted numerous orders for  Microsoft software products.

18  CLARK submitted orders for approximately 618 pieces of Microsoft software products.

19  Her orders included Windows 2000 Server with 25 Client Licenses with an estimated retail

20  value of $1,199, and the SQL Server 2000 Enterprise Edition with 25 Client Licenses with

21  an estimated retail value of $11,099.00.

22      74.    According to Microsoft, the type and quantities of software ordered by

23  CLARK had no relation to any legitimate Microsoft business in connection with her

24  employment duties.  All of the orders submitted by CLARK were shipped to her at the

25  Microsoft Corporation, 4200 150th Ave. NE, Redmond, WA 98052.

26  **III**    **CLARK's Proceeds of Illegal Activity.**

27

28  Complaint/Contini, et al - 27

75.     The Investigation has revealed that FINN CONTINI wrote bi-monthly or monthly checks made payable to CLARK during the same period of time CLARK submitted her orders for Microsoft software. Between May 2002, through January 2003, CONTINI paid CLARK approximately $196,680.00.

76.     Microsoft analysis of CLARK's emails contained on the corporate computer revealed the following email communications between CLARK and CONTINI:

77.     On February 10, 2003, CLARK wrote to CONTINI:

> ...It's almost like my sister. Last time she was getting on me about the whole money and where it came from thing (and telling me it's changed her whole opinion of me and she doesn't know how she'll ever get back to thinking well of me again),...I reminded her that she had *no* qualms about taking $3k from me to get her sewer pipe fixed, and she responded by saying no, she didn't have any problems with that, because she saw it as a "little bit of good coming out of a bad situation"...

78.     On May 20, 2003, CLARK wrote to CONTINI:

> Every time you tell me to stay debt free I feel horribly ashamed of myself for still having debt after everything you've done for me.   I's getting a handle on my "addiction," as it were – spending is way down, and when I do buy things for myself, I'm more able to pay cash now, thanks to you. But, that doesn't erase that I racked up before i managed to get a better handle on it. I'm working on it, and trying to do better and fight the depression that causes me to do it in the first place. I guess that's all I can do, since there's no more big cash payouts coming.

79.     On May 21, 2003, CONTINI responded to CLARK:

> Yeah, the cash payouts are a thing of the past.   A slumping economy would have put a damper on it anyway because nothing is moving these days (product still in the pipeline is just sitting on shelves). But you took what you got and put it to good use, an advantage few people will receive in their lifetime...

//

//

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## INVESTIGATION OF CHRISTINE J. HENDRICKSON

**I      HENDRICKSON's Employment with Microsoft.**

80.      HENDRICKSON began her full-time employment with Microsoft on or about March 13, 2000.  She was employed as a Group Assistant until her termination on June 12, 2002.  HENDRICKSON was given access to MS Market and the IPO Program as an employee of Microsoft.  HENDRICKSON's duties as Group Assistant including ordering supplies, hardware and software through the IPO Program for her group.

**II     HENDRICKSON's Ordering Activity.**

81.      Beginning in or about June 2001, and continuing through on or about June 12, 2002, HENDRICKSON placed through the IPO Program orders for 1726 pieces of Microsoft software, shipped to the following individuals:

| Shipped To | Quantity | estimated Retail Price |
| --- | --- | --- |
| Nathaniel Angelus | 552 | $4,742,208 |
| Ali Raisdanai | 488 | $1,894,042 |
| N. Candy | 300 | $1,231,620 |
| Christine Hendrickson | 192 | $378,118 |
| Miscellaneous | 194 | $1,483,736 |
| **Total** | **1726** | **$9,729,724** |

82.      According to the IPO Program order records, CONTINI was listed as the approving manager for 250 items ordered by HENDRICKSON.  CONTINI had no authority to approve HENDRICKSON's orders.  HENDRICKSON had no reporting relationship to CONTINI.

83.      HENDRICKSON caused to be shipped the largest quantity of software to Nathaniel Angelus, the same individual to whom CONTINI sent software and received large proceeds.  HENDRICKSON placed the orders for Angelus beginning in or about January 2002, through in or about May 2002.  The orders included 150 units of SQL

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Server 2000 Enterprise Edition International.  The estimated retail price of each SQL Server software is $19,999.00.  The software destined for Nathaniel Angelus were caused by HENDRICKSON to be shipped to the following addresses:

| Nathaniel Angelus | 6663 SW Beaverton-Hillsdale Hwy, Suite #PMB 271 Portland, OR 97225 |
| Business Data Solutions | 6701 SW Murray Blvd., PMB 286 Beaverton, OR 97008-4467 |
| Computer Partners | 9610 SE 82nd Ave., Suite C PMB #31 Portland, Oregon 97266 |

84.    All three addresses listed above are for mailbox rental centers.

85.    Oregon Secretary of State Corporation Division records show that Articles of Incorporation were filed for Business Data Solutions Co. and Computer Partners, Ltd. on May 17, 2002.  Both corporations filed Articles of Dissolution one month later on June 17, 2002.  The mailing address of both Business Data Solutions and Computer Partners was listed as 3132 SW Upper Drive, Portland, Oregon 97201, the same address associated with Nathaniel Angelus as set forth above.

86.    An analysis of the hard drive of the laptop computer assigned by Microsoft to HENDRICKSON revealed an email communication from CONTINI to HENDRICKSON in or about February or March of 2002.  In the email, CONTINI, using the email address finnwc00@yahoo.com writes: "Nathaniel rec'd 24 SQL NFR units today (only 20 were ordered – didn't I tell you the warehouse was fucked up?) and he said he should be able to make deposits by Thursday or Friday of this week.  Your net is a little over 17K.  This is all going better than I expected.  Finn."

87.    Analysis of HENDRICKSON's orders also demonstrated that she caused to be delivered large quantities of software to entities associated with Ali Raisdanai at the same mailbox addresses used by CONTINI to deliver software, including the

following:

| ADC | ALI RAISDANAI | 30251 Golden Lantern #160 Laguana Niguel, CA 92677 |
|---|---|---|
| TERATEC | AL RA ISDO | 27758 Santa Margarita Pkwy #162 Mission Viejo, CA 92691 |
| VIDCOM #199 | A. RASOLANI | 26741 Portola Pkwy, Suite 1E Foothills Ranch, CA 92610-1743 |

88.     On June 7, 2002, HENDRICKSON provided a brief handwritten statement to Microsoft admitting that she submitted internal product orders that caused software to be shipped directly to "A. Rasoldini / Ali". She described Raisdanai as someone who contacted her and claimed he had his own company and needed software for testing. Raisdanai allegedly told HENDRICKSON it was "no big deal" as it was something he did himself when he worked at Microsoft. Raisdanai later provided company names and addresses for other friends in the business so HENDRICKSON could also ship them software.

89.     A forensic analysis by a Microsoft investigator of the hard drive in the laptop computer Microsoft assigned to HENDRICKSON recovered evidence of email exchanges between CONTINI and HENDRICKSON regarding Ali Raisdanai. In or about February or March of 2002, an individual believed to be CONTINI, using the email address finnwc00@yahoo.com, wrote:

> This worked out better than a Word doc. I'd limit each notepad to two items because these tend to get a little long and Yahoo only supports so many lines. (It's always the little things, isn't it?) Ali sent your checks today – I'll call you a little later about picking them up. They total 18K. Everything we ordered for him has come in and been sold so this is your final payout from that first round of orders. I'll give you another round at the end of this month to placate him. Finn.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

90.     HENDRICKSON ordered software through the IPO Program in February 2002 and May 2002 and had it shipped to "N. Candy" or "N.C." using the following company names and addresses:

| GUARDIAN ENTERPRISES | N. CANDY | 15127 NE 24th Street # 297 Redmond, WA 98052 |
| SFX SOLUTIONS | N.C. | 11410 NE 124th Street, PMB #464 Kirkland, WA 98034 |

91.     Both of these addresses are mailbox rental centers.

92.     According to records of Pony Express Mail & Business Centers, 15126 NE 24th Street, Redmond, Washington 98052, mailbox #297 was rented by Nancy Condy, CONTINI's mother, until mid June 2002. The UPS store, 11410 NE 125th Street, Kirkland, Washington 98034 no longer had records relating to the rental of PMB #464 prior to December 2002.

93.     No records of any businesses with the names Guardian Enterprises or SFX Solutions, or a business owned by "N.Candy," was found in the Washington State Department of Revenue's State Business Records Database.

94.     No record of any businesses with the names of Guardian Enterprises or SFX Solutions was found on the Washington Secretary of State's website.

//

//

//

//

//

//

//

//

//

Complaint/Contini, et al - 32

95.    The types of Microsoft software HENDRICKSON had shipped to "N. Candy" and "N.C." included Windows 2000 Client Access License with 20 Microsoft License Packs, with an estimated retail value of $739.00 and SQL Server 2000 Enterprise Edition International with an estimated retail value of $19,999.00.

SONYA E. JOHNSON, Complainant
Special Agent,
Internal Revenue Service

Complaint and affidavit sworn to before me and subscribed in my presence, _____November 8_____, 2004.

MONICA J. BENTON
United States Magistrate Judge

Reviewed by:

KATHERYN KIM FRIERSON
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101
Telephone: (206) 553-4737
Fax: (206) 553-2502
E-mail: katheryn.k.frierson@usdoj.gov

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970